**In re Richard J. CARMEL, Debtor.**

**Richard J. CARMEL, Plaintiff,**

v.

**UNITED STATES of America, Commissioner of Internal Revenue Service, Defendants.**

**Bankruptcy No. 84 B 8411, No. 89 A 1134.**

United States Bankruptcy Court, N.D. Illinois, E.D.

Dec. 20, 1991.

Michael Hyman, Jeffrey Strange & Assoc. Wilmette, Ill., for plaintiff.

Benjamin Norris, Trial Atty., Tax Div., Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM OPINION

ERWIN I. KATZ, Bankruptcy Judge.

This matter comes before the Court on the Debtor's Complaint seeking a Determination of Tax Liability pursuant to section 505 of the Bankruptcy Code, Title 11, U.S.C. § 505. The Court has jurisdiction over this matter pursuant to Title 28, U.S.C. § 1334(b). The Complaint alleges that for the taxable years 1981 through 1984, the Commissioner erroneously determined that a tax deficiency existed by (1) treating funds embezzled by the debtor from various entities as taxable income; (2) treating funds reported as compensation to the Debtor on the corporate tax return of Debtor's professonal services corporation as taxable income when such funds actually represented loans to the Debtor; (3) disallowing the deduction of losses incurred through the Debtor's stock option trading

activities from the Debtor's embezzlement and other income on the grounds that the Debtor was not a dealer in stock options; (4) disallowing certain tax shelter losses and adding a penalty under Internal Revenue Code § 6661 for substantial understatement of income; and (5) adding various penalties under Internal Revenue Code § 6653 for fraudulent nonpayment of tax, under § 6654 for failure to pay estimated income tax, and under § 6661 for substantial understatement of tax liability. The United States filed an Answer to the Complaint which denies that the Commissioner erred in determining the tax deficiency. An evidentiary hearing was held in this matter, the parties presented post-trial oral arguments to the Court, and this matter was taken under advisement.

Having fully reviewed the evidence presented and the arguments and submissions of the parties, the Court finds that: (1) the income embezzled by the Debtor constitutes ordinary income taxable to the Debtor; (2) the Debtor failed to prove that the funds received from his professional service corporation actually represented loans to the Debtor, and thus the funds were properly treated as ordinary income received as compensation for services rendered; (3) the Debtor's stock market trading activities represent a trade or business in which the Debtor was engaged within the meaning of Internal Revenue Code § 62 and § 162, so that the Debtor may deduct the ordinary and necessary expenses of producing such business income; (4) the losses incurred by the Debtor as a result of the stock market trading activities constitute capital losses within the meaning of Internal Revenue Code § 1211 and § 1221, since the stocks and options traded did not constitute property properly included in the Debtor's inventory and the Debtor was not a dealer in such property; and (5) the Debtor's alleged gambling disorder did not preclude him from forming the requisite fraudulent intent to willfully evade payment of taxes for any of the tax years in question so that fraud penalties were properly applied pursuant to Internal Revenue Code § 6653. The following shall constitute the Court's Findings of Fact and Conclusions of Law pursuant to Bankruptcy Rule 7052.

## FACTS

The parties have submitted a limited Stipulation of Facts addressing the general magnitude and scope of the Debtor's trading activities for the years in question. A copy of this Stipulation is attached hereto and made a part hereof. In addition, the parties have asked the Court to take judicial notice of the decisions of the Seventh Circuit Court of Appeals and the District Court for the Northern District of Illinois regarding the Debtor's conviction for mail and wire fraud. *United States v. Carmel*, 801 F.2d 997 (7th Cir.1986); *Carmel*, 84 CR 508, Findings of Fact, Conclusions of Law, Opinion and Verdict (N.D.Ill.1985) (Will, J.). Based on this stipulation, the prior findings of these courts and the evidence presented therein, the Court makes the following findings of fact.

The Debtor in this proceeding, Richard J. Carmel, was a licensed attorney practicing in the State of Illinois since approximately 1960. The Debtor formed a professional service corporation, Richard J. Carmel, Ltd., in 1977 through which he engaged in the practice of law. The Debtor was the sole officer and shareholder of this corporation. The corporation subsequently became a partner in the law firm of Fischel & Kahn, with which the Debtor was associated. The Debtor's practice of law concentrated primarily in the area of real estate transactional law, with very limited income tax experience. In addition to his law practice, the Debtor engaged in heavy trading on the stock and options market. During the period in question, 1981 through 1984, the Debtor traded in stock options on the Chicago Board Options Exchange and the American Options Exchange, among others. The Debtor also traded in stocks with the following brokerage houses: Rodman & Renshaw, Cowen & Company, Interbank Equity Corporation, Dean Witter & Reynolds, among others. At no time, however, did the Debtor trade actively on the floor of any stock or options exchange. He was never a member of any exchange, nor was

he a registered broker, dealer or underwriter of securities. He had no customers of his own and received no commissions for his trading activities. The Debtor's activities consisted solely of trading on his own behalf through brokerage houses.

The Debtor testified that, in connection with his trading activities, he would call his brokers several times throughout the trading day in order to obtain information regarding his positions and general market activity. He testified that during 1981 approximately 30% of his day was spent in trading activities; in 1982 approximately 50% of the day; in 1983, 60–65%, and in 1984, 75–80% of his day was spent in trading activities. He further testified that in 1981 the average dollar value of his trading transactions consisted of hundreds of thousands of dollars; in 1982, several hundred to several million dollars; in 1983, several hundreds of thousands to several million dollars, reaching a high of approximately $2.7 million; and in 1984 the magnitude of the transactions was several hundreds of thousands to several million dollars. The attached stipulation also addresses the general magnitude of the Debtor's activities, and without making an actual finding regarding the specific dollar values involved, the Court accepts the validity of these assertions. The Debtor testified that he was a day trader, meaning that he traded on the basis of certain technical considerations, attempting to take advantage of short-term movements in the marketplace. He was not concerned with profit due to dividends or long-term capital gain, focusing instead on short-term profits in his trading activities. The Debtor testified that he typically bought calls, although occasionally he dealt in puts also.[1] According to the Debtor, due to various downturns and fluctuations in the market, he suffered severe losses in his trading activities and was forced to discontinue these transactions in March of 1984.

In connection with losses incurred through his market activities, the Debtor began the practice of embezzling funds from the accounts of certain clients involved in his law practice and from family members. The Debtor devised a scheme through which he embezzled approximately $7.5 million by defrauding various entities over a ten-year period. The Debtor testified that this embezzlement and stock market activity began as early as 1972 and lasted through March of 1984. Certain checks were presented in evidence reflecting funds allegedly embezzled from the Debtor's various clients, and the Debtor testified regarding those transactions. The Court also takes judicial notice of the prior convictions for mail and wire fraud relating to these embezzlement activities entered by the District Court for the Northern District of Illinois, and the criminal appeal to the Seventh Circuit Court of Appeals upholding those convictions. *United States v. Carmel,* 801 F.2d 997 (7th Cir.1986); *Carmel,* 84 CR 508, Findings of Fact, Conclusions of Law, Opinion and Verdict (N.D.Ill.1985) (Will, J.). The Debtor testified that on March 14, 1984, he confessed his embezzlement and stock market gambling activities and a criminal investigation was begun shortly thereafter. As a result of this investigation, the Debtor was convicted of mail and wire fraud by the District Court for the Northern District of Illinois and was sentenced to a period of incarceration lasting from June 10, 1985 through March of 1988. At that time the Debtor was released to a half-way house where he remained until August 31, 1988, when his sentence was completed.

The Debtor testified that in connection with his trading activities, he would prepare certain records of his positions. According to the Debtor, he did not maintain these records in any systematic manner and would routinely destroy such records a few days after their preparation. In addition to his own calculations and hand-prepared records, the Debtor received trading slips and statements of his accounts from his various brokers which provide some evidence of the transactions involved in his

---

1. Puts and calls consist of contracts to purchase and sell options on the futures market to take advantage of market fluctuations.

trading activities during the period in question.

This matter is now before the Court in connection with the Debtor's failure to file tax returns reporting his embezzlement income and his stock market activities for the taxable years 1981 through 1984. The Debtor did not file personal income tax returns for any of the tax years in question. The Debtor testified that he did feel that he owed some tax and he wanted the government to be aware of it, but that he was very confused as to how to handle the transaction and did not file returns reporting his activity. He also testified, however, that he did make a payment of $20,000 towards his estimated taxes in 1983 for the taxable year 1982. This money was subsequently returned by the government when they were unable to determine any tax liability to which it might apply. The Debtor caused his professional service corporation, Richard J. Carmel, Ltd., to file corporate tax returns for the years 1981, 1982 and 1983. The corporation operated on a fiscal year basis with the year-end March 30. Each of these returns listed some amount as having paid to the Debtor in the form of compensation for services rendered as an officer of the corporation. These tax returns also list certain amounts as loans made to shareholders during the taxable year.

Shortly after his confession in 1984, the Debtor began undergoing psychiatric treatment for a gambling addiction disorder. In connection with the criminal proceedings against him, the Debtor's treating physician testified that the Debtor suffered from a compulsive gambling disorder, which allegedly prevented him from forming the criminal intent necessary to support a conviction of fraud. This insanity defense was rejected by the District Court for the Northern District of Illinois and this decision was upheld on appeal by the Seventh Circuit Court of Appeals. The Debtor's treating physician also testified in the instant adversary proceeding that the Debtor's gambling disorder precluded him from

formulating the necessary fraudulent intent to wilfully evade payment of the taxes due since this action would have required him to recognize the magnitude of his gambling addiction and embezzlement. According to the Debtor, he attempted to file a tax return during his incarceration but was precluded from obtaining the necessary access to his books and records. He also testified that he requested an extension for the time to file from the Internal Revenue Service and received no response to this request until 1988 when he received a notice of deficiency for the taxable years in question. The Debtor is now challenging this notice of deficiency in these proceedings.

The Debtor filed this chapter 7 bankruptcy proceeding on March 22, 1984. A Notice of Tax Deficiency was served upon the Debtor 1988 and the Debtor responded to the Notice of Deficiency by filing a Petition with the United States Tax Court on March 21, 1989 contesting the deficiency. This Petition was subsequently dismissed by the Tax Court for lack of jurisdiction and the Debtor proceeded to file the instant adversary proceeding to resolve the dispute as to his tax liability.

## DISCUSSION

There are two primary issues raised by the Debtor's Complaint: (1) whether the Debtor was engaged in a trade or business by virtue of his stock market trading activities which would allow him to deduct his trading losses against embezzled income as the ordinary losses incurred in a trade or business despite the capital loss limitations of Internal Revenue Code § 1211 and § 1221,[2] and (2) whether the Debtor's alleged gambling addiction prevented him from formulating the requisite fraudulent intent to willfully evade payment of taxes so that fraud penalties were wrongfully imposed under Internal Revenue Code § 6653, Title 26 U.S.C. § 6653 [hereinafter I.R.C.]. The other issues initially raised in the Complaint concerning the alleged improper disallowance of certain tax shel-

---

**2.** The capital loss limitations of § 1211 have now been repealed, but such limitations were in

effect during the taxable years in question and are applicable to this proceeding.

ter/partnership losses and the related penalty for substantial understatement of income pursuant to § 6661 have apparently been resolved by the agreement of the parties to apply any distribution of assets from the estate to the earliest tax liabilities first. Transcript, Jan. 8, 1991, at pp. 3–4, 6. The Court will therefore not address these issues. Likewise, the propriety of the penalties assessed for the negligent failure to file tax returns resulting in an underpayment of taxes is controlled by this Court's decision regarding the taxability of the embezzlement income and the deductibility of the trading losses so that these issues need not be separately addressed by the Court. The parties have agreed that the Court's current ruling shall be limited to the proper treatment of the debtor's income and losses, leaving them to subsequently prepare a return calculating the actual tax liability, if any, based on the Court's determination of the income and loss issues. Transcript, Jan. 8, 1991, pp. 6, 7–9; Feb. 12, 1991, pp. 3–4.

## I. WHETHER THE LOSSES CAN BE OFFSET AGAINST AND FULLY DEDUCTED FROM EMBEZZLED INCOME AND INCOME FROM THE DEBTOR'S PROFESSIONAL SERVICE CORPORATION

The Debtor initially asserted that he was a dealer in stocks and options and thus the property traded would constitute inventory held by the Debtor and the capital loss limitations of I.R.C. § 1211 and § 1221 would not apply. Assuming the definition of capital assets set forth in I.R.C. § 1221 did not encompass the stocks and options traded by the Debtor, the related trading losses would be deductible as ordinary losses incurred in the Debtor's trade or business. In the course of the trial and in oral arguments, however, the Debtor abandoned this position and argued that he was engaged in the business of gambling through his stock market activities, so that the related losses would be fully deductible as the ordinary losses incurred in the business of gambling. According to the Debtor, since these gambling losses are fully deductible and exceed the embezzled in-

come and other income from his professional service corporation, there was no tax due and owing for the tax years in question and thus the Debtor is not subject to fraud penalties for willful understatement of income or failure to pay taxes. The Court rejects this position and finds that the Debtor was in the business of trading stocks and options which constituted capital assets and therefore the capital loss limitations of I.R.C. § 1221 are applicable. The Debtor, although engaged in a speculative and risky activity, was not entitled to deduct his trading losses as the ordinary and necessary expenses of gambling when those activities involved capital assets which were not held as inventory by a dealer in securities.

## A. INCOME RECEIVED BY THE DEBTOR DURING TAX YEARS 1981 THROUGH 1984

Income for tax purposes is defined by the Internal Revenue Code as all income from whatever source derived, unless specifically excluded by other applicable federal law. I.R.C. § 61. In *Eisner v. Macomber*, 252 U.S. 189, 207, 40 S.Ct. 189, 193, 64 L.Ed. 521 (1920), the Supreme Court defined income as "the gain derived from capital, from labor, or from both combined, provided it be understood to include profit gained through a sale or conversion of capital assets." This broad definition operates to tax all gains except those specifically excluded by statute. *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 429–30, 75 S.Ct. 473, 475–76, 99 L.Ed. 483 (1955). Applying these standards, the funds embezzled by the Debtor and the monies received from the professional service corporation would constitute taxable income to the Debtor.

### 1. *Funds embezzled by the Debtor constitute taxable income to the Debtor.*

■ Income obtained illegally is taxed under the Internal Revenue Code in the same manner as other income even though it is obtained without claim of right. *Commissioner v. Tellier*, 383 U.S. 687, 86 S.Ct. 1118, 16 L.Ed.2d 185 (1966); *James v.*

*United States,* 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961). In *James v. United States,* 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961), the Supreme Court held that embezzled funds are properly included in gross income of the embezzler for income tax purposes in the year in which they are misappropriated. "When a taxpayer acquires earnings, lawfully or unlawfully, without the consensual recognition, express or implied, of an obligation to repay, and without restriction as to their disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent." *Id.* at 218, 81 S.Ct. at 1055. The Court reasoned that where the taxpayer has actual command over the property taxed, he has received the actual benefit for which the tax is paid and must include such items in his taxable income. Embezzled funds, therefore, represent income to the embezzler even though such funds are deemed held in a constructive trust for the benefit of the victims. *Id.* at 215–17, 81 S.Ct. at 1053–54. *See also Solomon v. Commissioner,* 732 F.2d 1459 (6th Cir. 1984); *Beaton v. Commissioner,* ¶ 80,413 P.H.Memo.T.C. pp. 1778–79 (1980); *Muldrow v. Commissioner,* 38 T.C. 907, 912 (1962).

The Debtor here has been convicted of numerous counts of mail and wire fraud involving a scheme where the Debtor illegally embezzled and converted funds from his clients to obtain money to invest in stock options in an effort to recoup his losses. *U.S. v. Carmel,* 801 F.2d 997 (7th Cir.1986); *Carmel,* 84 CR 508, Findings of Fact, Conclusions of Law, Opinion and Verdict (N.D.Ill.1985) (Will, J.). These earlier convictions establish that the Debtor received income in the form of embezzled funds and illegally obtained monies. The parties have previously agreed that this Court shall not attempt to determine the dollar value of embezzled income or the ultimate tax, if any, found to be owing at this time. Transcript, Jan. 8, 1991, pp. 7–9. The Court, therefore, finds that any funds embezzled or otherwise illegally obtained by the Debtor during taxable years 1981 through 1984 represent income which is properly taxed to the Debtor.

2. *Funds received by the Debtor as compensation from his professional service corporation constitute taxable income to the Debtor.*

■ The Debtor's complaint asserts that the IRS erred in treating "as income certain funds attributable to [the debtor] as income based on the 1120 Corporate Income Tax Returns of Debtor's wholly owned personal service corporation, Richard J. Carmel, Ltd., for taxable years 1981 through 1983." The Debtor's answers to the IRS's interrogatories state that the Debtor periodically received advances from Richard J. Carmel, Ltd., which were repayable but that these obligations to repay were discharged in this bankruptcy proceeding. According to the Debtor, these advances represented loans from the corporation which were not properly included in the taxable income of the Debtor.

■ Funds received by a taxpayer pursuant to a loan with a corresponding obligation to repay such funds do not constitute taxable income to the taxpayer. *North American Oil Consolidated v. Burnet,* 286 U.S. 417, 424, 52 S.Ct. 613, 615, 76 L.Ed. 1197 (1932). The Court must find, however, that the transaction is properly treated as a loan with a corresponding liability. The factors looked at by courts to determine whether a transaction constitutes a valid debt include: the existence of a written or formal debt instrument, the existence of specific terms for the debt, such as a designated rate of interest or a specific date for repayment, whether the taxpayer had any legal obligation to repay the loan, and whether the taxpayer held an actual intent to repay the loan. Applying these standards to the current facts, the evidence presented fails to establish that the alleged transactions between the debtor and his professional service corporation actually involved loans, and therefore the Court finds that the amounts shown as compensation to the debtor on the corporate tax returns were properly included as taxable income to the Debtor.

The corporation in question, Richard J. Carmel, Ltd., was formed by the Debtor in 1977 for the purpose of practicing law. The Debtor was the sole shareholder of the corporation and revenues of the corporation were derived from the Debtor's practice of law and later from the Debtor's practice of law with the law firm of Fischel and Kahn. The Debtor testified that it was his practice as sole shareholder to borrow money from the corporation throughout the taxable year and that such transactions would be characterized on the corporate books as a loan with a corresponding repayment obligation. At the end of each taxable year the Debtor testified that he would discuss these loans with his accountant to determine what portion of the outstanding loans should be "recharacterized" and reported as compensation to the Debtor for that taxable year. Once the Debtor determined the appropriate amount of compensation for the taxable year, the accountant would make an adjusting entry reducing the loan balance and reporting compensation paid out by the corporation to the Debtor. Thus, according to the Debtor, for each taxable year in question there would be an amount reported as compensation on the corporate tax return and an additional outstanding loan amount reported on the corporate tax return.[3]

The Commissioner has included as income to the Debtor the amounts reported as compensation to the Debtor on Line 12 of the corporate tax returns filed by Richard J. Carmel for 1981, 1982 and 1983. The Commissioner has not attempted to include as income the amounts shown as loan to stockholders on those tax returns, although the Debtor testified that there was no formal loan documentation, no set interest rate and no set repayment date for any of the loans. It is the Debtor's position that the amounts listed as compensation also constitute loans to stockholders which should not be included in his taxable income. The basis for this position is unclear to the Court since the Debtor testified that he was the sole officer and shareholder of the corporation, he did perform services for the corporation and a determination was made at the end of each taxable year as to the proper amount of compensation due to the officers for the year. Despite this testimony, the Debtor now argues that these funds actually represented loans made by Richard J. Carmel, Ltd., to the Debtor and that the Debtor was obligated to repay these funds even though there were no formal debt instruments, no set interest rate and no specific date for repayment of the funds. The Debtor failed to explain, however, why these amounts were reported as compensation on the corporate tax returns rather than being listed as loans to stockholders with the other loan amounts shown on the tax returns. The Court finds, therefore, that the amounts listed on the corporate tax returns as compensation to officers were properly included by the Commissioner as taxable income to the Debtor.

## B. ALLOWABLE TRADE OR BUSINESS LOSSES INCURRED BY THE DEBTOR DURING TAX YEARS 1981 THROUGH 1984 WHICH MAY BE USED TO OFFSET EMBEZZLEMENT AND OTHER INCOME

Having found that the funds embezzled by the Debtor and the compensation received by the Debtor from his professional service corporation are properly included in

---

**3.** The corporation was filing its tax returns on a fiscal year basis, with year-end March 30. This resulted in the income listed on the corporate year return for fiscal year 1980 being attributed as taxable income to the Debtor in his taxable year 1981, and so on. The specific amounts shown on the corporate returns are as follows:

| | | Loans | |
| Fiscal Year | Compensation | Beginning | Ending |
| --- | --- | --- | --- |
| 1980 | $74,200 | $ 57,321 | $ 40,837 |
| 1981 | $70,000 | $ 40,837 | $119,501 |
| 1982 | $60,000 | $119,501 | $ 51,422 |

Corporate tax returns were not filed for fiscal year 1983, corresponding to the Debtor's taxable year 1984.

taxable income, the Court must now determine the extent to which the Debtor's market trading losses may be deducted from or used to offset this income.

1. *Applicable Statutory Provisions Under the Internal Revenue Code*

Section 61 of the Internal Revenue Code provides that:

gross income means all income from whatever source derived, including but not limited to (1) compensation for services, including fees, commissions, fringe benefits and similar items; (2) gross income derived from business, (3) gains derived from dealings in property, (4) interest, (5) rents, (6) royalties, (7) dividends, (8) alimony and separate maintenance payments, (9) annuities, (10) income from life insurance and endowment contracts, (11) pensions, (12) income from discharge of indebtedness, (13) distributive share of partnership gross income, (14) income in respect of a decedent, and (15) income from an interest in an estate or trust.

Building on this definition of gross income, § 62 of the Internal Revenue Code provides that the term "adjusted gross income" means, in the case of an individual, gross income minus certain deductions, including trade and business deductions and deductions from the sale or exchange of property.

Such trade and business deductions are limited to "the deductions allowed by this chapter (other than by Part VII of this subchapter) which are attributable to a trade or business carried on by the taxpayer if such trade or business does not consist of the performance of services by the taxpayer as an employee." The trade or business deductions allowed by the relevant chapter (other than part VII) are set forth in § 162, which provides in relevant part:

there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—(1) a reasonable allowance for salaries or other compensation for personal services actually rendered; (2) traveling expenses (including amounts expended for meals and lodging other than amounts which are lavish or extravagant under the circumstances) while away from home in the pursuit of a trade or business and (3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.

Likewise, the deduction for losses from the sale or exchange of property are limited under § 62 to those deductions "allowed by part VI (sec. 161 and following) for losses from the sale or exchange of property." Such deductions are set forth in § 165, which states as a general rule that there shall be allowed as a deduction any loss sustained during the taxable year not compensated for by insurance or otherwise. In the event of a loss from the sale or exchange of property, however, the deduction is limited (1) under subsection (b) to the loss calculated using the adjusted basis of the property and (2) under subsection (f) to the amounts allowed in § 1211 and § 1221 for losses from the sale or exchange of capital assets.

Under these statutory provisions, a taxpayer's gross income includes all income, gains and profits from whatever source derived including compensation for services and gains from the disposition of property. The taxpayer's adjusted gross income will consist of gross income minus deductions for trade and business expenses and for losses relating to the sale or exchange of property. Following the calculation of adjusted gross income, the I.R.C. provides for the deduction of certain additional items from adjusted gross income so as to arrive at taxable income. I.R.C. § 63. These "itemized deductions" are set forth in §§ 161–196, and include additional deductions for certain types of losses set forth in § 165.

The specific losses which may be deducted from adjusted gross income to derive taxable income include deductions for certain losses, such as wagering losses, theft losses, worthless security losses, and casualty losses. Section 165 states as a general rule that there shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise, but subsection (c) limits the deduction in the case of an individual to

(1) losses incurred in a trade or business, (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business, and (3) except as provided in subsection (h) [governing casualty gains and losses] losses of property not connected with a trade or business or a transaction entered into for profit, if such losses arise from fire, storm, shipwreck or other casualty or from theft.

Subsection (d) further provides that losses from wagering transactions shall be allowed only to the extent of the gains from such transactions. Thus, under § 165 taxpayers are entitled to an itemized deduction for certain losses, such as wagering losses or casualty losses but actual amount allowed as a deduction is limited and varies with the category of loss involved. To summarize these statutory provisions, the basic scheme of taxation set forth in the Internal Revenue Code provides for the accumulation of all gains, profits and income from whatever source derived as gross income, which is then reduced by deductions for ordinary and necessary expenses incurred in the taxpayer's trade or business under § 162, and deductions for losses from the sale or exchange of property sustained during the taxable year under § 165, such as losses from the sale or exchange of capital assets, to derive adjusted gross income. Additional itemized deductions are then allowed in lieu of the standard deduction under § 165, such as deductions for losses from wagering transactions to the extent of the gain from such transactions.

### 2. The Debtor was "engaged in the trade or business" of trading on the stock market.

In this case, the Debtor argues that the Commissioner erred in disallowing the deduction of the Debtor's stock and option trading losses from the Debtor's income received from embezzlement and as compensation from his professional service corporation. In the Complaint, the Debtor initially argued that he was engaged in the trade or business of dealing in stocks and options and was holding such property as inventory, rather than as a capital asset. Assuming the Debtor was properly characterized as a dealer in stocks and options, the capital loss limitations of § 1211 and § 1221 would be inapplicable and the losses incurred would be deductible as losses incurred in the taxpayer's trade or business. At trial, however, the Debtor abandoned the argument that he should be considered as a dealer in stocks and options and argued instead that he was engaged in the trade or business of gambling through the stock market. According to the Debtor, even though these capital assets were not held as inventory, his losses from gambling on the market should be allowed in full as trade or business losses without reference to the capital loss limitations of § 1211 and § 1221. The Debtor essentially argues that when a taxpayer is in the trade or business of gambling, losses incurred from such gambling activities are deductible as trade or business losses even though the gambling activity involves what would otherwise be considered a capital asset. The Debtor also argues that subsection (d) of § 165, limiting the deduction of losses from wagering transactions to the extent of gains from such transactions, does not apply when the taxpayer is engaged in the trade or business of gambling since trade or business losses are deductible without reference to the wagering loss limitations of § 165. Under this approach, gambling losses incurred as the trade or business of the Debtor would be allowed in full under the general provision of § 165 as a trade or business loss.

Having fully reviewed the arguments presented by both parties, the Court concludes that the Debtor was engaged in the trade or business of trading stocks and options and that the Debtor held such stocks and options as capital assets used in his trade or business, making his related losses subject to the capital loss limitations of § 1211 and § 1221. Under the literal language of § 1221, property used in connection with a trade or business will be treated as a capital asset unless it is held as inventory by a dealer in such property. The Debtor concedes that he was not such a dealer in stocks or options and thus capital loss treatment for his trading activities is mandated by the I.R.C. provisions. Furthermore, even assuming the debtor was in the trade or business of gambling, he may not escape the capital loss limitations since the property was not held for use in his trade or business as inventory for resale to customers. The holding of the Supreme Court decision in *Commissioner v. Groetzinger*, 480 U.S. 23, 107 S.Ct. 980, 94 L.Ed.2d 25 (1987), cannot be read as excluding capital assets from such treatment merely because such assets are used in the trade or business of gambling. Therefore, the Commissioner correctly treated the stocks and options traded by the Debtor as capital assets and limited the deduction of the related losses for each taxable year pursuant to § 1211 and § 165.

Although the phrase is used repeatedly, the Internal Revenue Code does not define the meaning of "trade or business." The tax treatment of a particular taxpayer (such as the deductibility of certain expenses or losses) frequently depends upon the fact sensitive question of whether the taxpayer is engaged in a trade or business, making this a highly litigated issue. In the context of securities trading and market activities, courts are frequently called upon to determine whether the taxpayer's trading activities rise to the level of carrying on a trade or business, or whether the taxpayer is merely an investor engaged in the production of income. This determination turns on the facts and circumstances of each case *Higgins v. Commissioner*, 312 U.S. 212, 217, 61 S.Ct. 475, 478, 85 L.Ed. 783 (1941). The relevant facts and circumstances include the taxpayer's investment intent, the nature of the income to be derived from the activity, and the frequency, extent and regularity of the taxpayer's security transactions, *Estate of Yaeger v. Commissioner*, 889 F.2d 29 (2d Cir.1989), cert. den. —— U.S. ——, 110 S.Ct. 2205, 109 L.Ed.2d 531 (1990) (citing *Moller v. United States*, 721 F.2d 810 (D.C.Cir.1983), *cert. den.* 467 U.S. 1251, 104 S.Ct. 3534, 82 L.Ed.2d 839 (1984). A taxpayer who is in the business of trading securities generally derives profits from the direct management of purchasing and selling such securities. In contrast, an investor generally derives profit from the interest, dividends and capital appreciation of securities. *Moller*, 721 F.2d 810 (D.C.1983); *Purvis v. Commissioner*, 530 F.2d 1332 (9th Cir.1976); *Liang v. Commissioner*, 23 T.C. 1040 (1955). Investors are primarily interested in the long-term growth potential of the security, while traders buy and sell securities with reasonable frequency in an effort to catch the swings in the daily market movements and profit thereby on a short-term basis. *Purvis*, 530 F.2d 1332 (quoting *Liang*, 23 T.C. 1040 (1955)). Thus, a primary distinction between traders and investors is the length of the period for which the property is held and the source of the profit derived from the property.

Applying these criteria to the instant facts, the Court finds that the Debtor was engaged in the trade or business of trading stocks and options on the market. The parties submitted a stipulation of facts which summarized the approximate magnitude of (1) the number of the Debtor's security transactions for the period of time 1981 through 1984; (2) the quantity of securities involved in these transactions, and (3) the dollar amounts of these transactions. Based on these stipulated summaries, the Court concludes that the Debtor was actively involved in buying and selling stocks and options in an effort to profit from the movement in the market on a short-term basis, and is therefore properly treated as engaged in the trade or business of stock market trading for tax purposes.

The IRS agrees that the Debtor was a trader rather than an investor, "because he attempted to profit from the short-term day-to-day changes in the market, rather than the long-term appreciation of his securities." United States Brief, p. 8, footnote 10. This position is also consistent with the treatment accorded to the Debtor by the Commissioner in assessing the contested deficiencies. The deficiency calculations treat the Debtor as having incurred income and losses in the ordinary course of his trade or business, but limit the deduction of such losses pursuant to the capital loss provisions of § 1211 and § 1221.

The trading losses incurred in the Debtor's trade or business are within the scope of § 1211 and § 1221 since the stocks and options constituted capital assets in the hands of the Debtor.[4] Section 1221 defines a capital asset as property held by the taxpayer whether or not connected with his trade or business, except for stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business.[5] Under this definition, the stocks and options held by the Debtor in connection with his trading business would constitute capital assets unless they were held as inventory, primarily for resale to

customers in the ordinary course of business.[6]

The Debtor argues, however, that the capital asset distinction is not limited to property held for resale or as inventory and asserts that the Court must consider the intent of the taxpayer in acquiring the asset, the purpose for which the asset was acquired, and whether the taxpayer actually held an interest in the asset. In *Arkansas Best Corporation v. Commissioner,* 485 U.S. 212, 108 S.Ct. 971, 99 L.Ed.2d 183 (1988), the Supreme Court rejected a similar argument and held that the dealer-inventory exception to the definition of a capital asset does not include property which is acquired and held for a business purpose. The exclusion of property from the capital asset definition does not turn on the motivation of the taxpayer in its acquisition, nor is it relevant that the property is connected to or used in the taxpayer's business. Rather, the capital asset exclusions are expressly limited to property which is held as inventory of the taxpayer for resale to customers in the ordinary course of business. *Id.* The Court in *Arkansas Best* reasoned that, based on the literal language of the statute and its legislative history, the general definition of § 1221 is to be interpreted broadly, while the exceptions listed therein must be narrowly construed as the exclusive list of exceptions to the definition.[7]

4. The specific limitations on capital losses are set forth in § 1211 and § 1212, which provide for certain limited capital loss carrybacks and carryovers. Section 1211 provides that in the case of a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of gains from such sales or exchanges. In the case of a taxpayer other than a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of the gains from such sales or exchanges, plus, if such losses exceed such gains, the lower of (1) $3,000, or (2) the excess of such losses over such gains.

5. There are four additional exceptions to the basic definition of a capital asset, relating in general to depreciable business property, intellectual property, accounts receivable, and certain governmental publications, which are not relevant to this proceeding.

6. Section 1234(a)(1) of the Internal revenue Code provides that losses attributable to the sale or exchange or lapse of an option take the same character as the underlying property. Thus, losses relating to the options traded by the debtor will be treated in the same manner as those relating to the underlying stock.

7. The Court also stated in *Arkansas Best* that the *Corn Products* doctrine is properly interpreted as standing for the narrow proposition that only those hedging transactions which are an integral part of the business-inventory purchase system fall within the inventory exclusion of § 1221. *Id.* 485 U.S. at 222, 108 S.Ct. at 977. The Debtor here is not involved in hedging transactions so that the *Corn Products* doctrine is literally not applicable. *Corn Products Refining Company v. Commissioner,* 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955).

Applying the capital asset definition and the dealer-inventory exception set forth in § 1221 to the instant facts, the Court concludes that the stocks and options traded by the Debtor constitute capital assets which were not held as inventory by the Debtor for sale to customers in the ordinary course of business. Whether a particular taxpayer is a dealer in securities or a trader is question of fact. *Kemon v. Commissioner,* 16 T.C. 1026 (1951). "A dealer in securities sells his property to customers and is comparable to a merchant in that he purchases his stock in trade, the securities, with the expectation of reselling at a profit, not because of a rise in value during the interval of time between purchase and resale, but merely because he has or hopes to find a market of buyers who will purchase from him at a price in excess of cost." This excess, or mark-up, represents remuneration for his labor as a middleman bringing together buyer and seller, and for performing the usual services of retailer or wholesaler of goods. *See also Michelson,* ¶ 90,027 P.H. Memo T.C. (1990).

The Debtor here was not a dealer under this standard. Rather, he sought to profit from short-term fluctuations in market value and was not acting as a middleman or a merchant offering goods to customers. Thus, regardless of the magnitude of the Debtor's transactions, the nature of his activities was such that he does not qualify as a dealer holding stocks and options as inventory within the meaning of the dealer-inventory exception to the capital asset definition. *See also Faroll v. Jarecki,* 231 F.2d 281 (7th Cir.1956). In recognition of this principle, the Debtor stated at oral argument that he was no longer taking the position that he was entitled to be treated as a dealer in stock options for purposes of determining the deductibility of his trading losses. Therefore, based on the applicable law and the Debtor's retraction of this argument, the Court finds that the dealer inventory exception to the capital asset definition set forth in § 1221 is not applicable to the Debtor's trading activities in tax years 1981 through 1984. The Debtor's trading losses were clearly related to capital assets used in his trade or business and are therefore subject to the loss limitations of § 1211.

3. *The holding of Groetzinger does not remove losses incurred from the sale of capital assets used in the trade or business of gambling from the scope of the § 1211 capital loss limitations.*

■ The Debtor argues, alternatively, that he was engaged in the trade or business of gambling through his market trading activities. According to the Debtor, the Supreme Court decision in *Commissioner v. Groetzinger,* 480 U.S. 23, 107 S.Ct. 980, 94 L.Ed.2d 25 (1987), established that taxpayers are entitled to deduct losses from gross income without regard to the capital loss limitations when such losses are incurred in the business of gambling. The Court finds, however, that the holding of *Groetzinger* cannot be extended to convert the business of market trading into the business of gambling and thus remove the trading losses from the literal language of the capital loss limitations in § 1211 and 1221.

The issue in *Groetzinger,* 480 U.S. 23, 107 S.Ct. 980, 94 L.Ed.2d 25 (1987), was whether a taxpayer who was involved in betting on greyhound races on a consistent and regular basis (from 60 to 80 hours each week) could be considered to be engaged in the trade or business of gambling within the meaning of § 162 and § 62 of the Internal Revenue Code. Assuming the taxpayer was correctly found to be in the trade or business of gambling, his related expenses and losses from such trade or business could be used to reduce the items of tax preference which would subject the taxpayer to the alternative minimum tax under § 56(a) of the Internal Revenue Code. If, however, these expenses and losses were not attributable to a trade or business, the tax preference items could not properly be reduced and the taxpayer would be subject to a greater alternative minimum tax base. The Supreme Court held that the determination of whether a taxpayer is engaged in a trade or business requires an examination of the facts in each case, thus adopting the general position previously taken by the court in *Higgins v. Commissioner,* 312 U.S. 212, 61 S.Ct. 475, 85 L.Ed. 783 (1941).

*Id.* 480 U.S. at 36, 107 S.Ct. at 987. The Court rejected the standard offered by the Commissioner which would require a finding that the taxpayer held himself out to others as engaged in the selling of goods or services. *Id.* 480 U.S. at 34, 107 S.Ct. at 986.

In rejecting this standard, the Court resolved a long-standing conflict over the meaning of the phrase, "engaged in trade or business," and expressly held that "to be engaged in a trade or business the taxpayer must be involved in the activity with continuity and regularity and that the taxpayer's primary purpose for engaging in the activity must be for income or profit. A sporadic activity, a hobby or an amusement diversion does not qualify." *Id.* 480 U.S. at 35, 107 S.Ct. at 987. In *Groetzinger*, the taxpayer was engaged in betting on greyhound racing as a livelihood, involving a constant and large-scale effort and the use of considerable skill. The Court found that these full-time gambling activities were sufficient to constitute the trade or business of gambling. *Id.* at 36, 107 S.Ct. at 987.

In the discussion of the goods and services test which it ultimately rejected, the Court noted that a full-time gambler ought to qualify as being in a trade or business as much as a full-time trader. *Id.* at 33–34, 107 S.Ct. at 986–87. The Court did not hold, however, that an active trader is engaged in the trade or business of gambling. The issue before the Court in *Groetzinger* was limited to whether a full-time gambler is entitled to deduct his expenses and losses as incurred in a trade or business for the purpose of reducing his tax preference items and the alternative minimum tax base. The *Groetzinger* opinion in no way addresses the issue of whether the losses incurred by a taxpayer in the trade or business of stock option trading are somehow removed from the capital loss limitations of § 1211 and § 1221 by virtue of the fact that they were incurred "in the trade or business of gambling."

The Debtor mischaracterizes the holding of *Groetzinger* in arguing that "under the authority of *Commissioner v. Groetzinger*, Debtor was engaged in a trade or business, entitled to deduct his losses from his gross income (from whatever sources) and is no more limited by express statutory limitations on deductions for capital losses than was Mr. Groetzinger limited by similar express statutory limitations on deductions for gambling losses." Debtor's post-trial brief, p. 13. Contrary to the Debtor's argument, the definition of capital asset in § 1221 includes all property held by the taxpayer whether or not connected with his trade or business unless such property is held as stock in trade, inventory or the taxpayer is a dealer in such property holding it for sale to customers in the ordinary course of his trade or business. Under the literal language of this provision, the stocks and options traded by the Debtor constitute capital assets subject to the capital loss limitations even though such property is connected to the Debtor's trade or business.[8] The Supreme Court's decision in *Groetzinger* does not alter or overrule the literal language of §§ 1211 and 1221. *Groetzinger* did not even address those provisions. The court in *Groetzinger* was not concerned with § 1221 since the taxpayer's business of betting on greyhound racing did not involve property which may appreciate or depreciate in value. In contrast, the Debtor's activities in trading on the market clearly constitute capital asset activities even though such property is connected with the taxpayer's trade or business. The Court finds, therefore, that the losses incurred by the Debtor as a result of his trading activities, constitute capital losses subject to the limitations of § 1211.

## II. WHETHER THE DEBTOR IS PROPERLY SUBJECT TO PENALTIES FOR FRAUDULENTLY UNDERSTATING AND WILLFULLY FAILING TO REPORT HIS INCOME

The Debtor also argues that the Internal Revenue Service improperly imposed civil

---

**8.** The Supreme Court held in *Arkansas Best* that capital asset property which is acquired and held for a business purpose is not excluded from the capital asset definition and does not qualify for ordinary asset treatment. Thus, even though the stocks and options traded by the Debtor were involved in his trade or business, such property and the related losses are subject to capital loss treatment. See discussion supra p. 902–903.

fraud penalties relating to the Debtor's willful failure to file income tax returns for the years in question. During the taxable years in question, § 6653(b) of the Internal Revenue Code essentially provided that if any part of an underpayment of tax required to be shown on a return was due to fraud, certain 50% penalties would be imposed.[9] Based on this provision, the IRS assessed fraud penalties against the Debtor for the underpayment of taxes relating to his embezzlement income and related to his trading activities. The Debtor argues that he should not be held liable for these fraud penalties since he failed to possess the requisite fraudulent intent to evade a tax believed to be owing in that (1) the Debtor's gambling addiction prevented him from forming the requisite intent necessary to commit fraud; (2) the Debtor is analogous to a tax protestor who affirmatively alerts the government of his intent not to file and should thereby escape liability for fraud penalties; and (3) the Debtor's incarceration prevented him from filing the tax returns in question so that this failure was not a willful omission. The Court finds, however, that the Debtor did possess the requisite fraudulent intent so that penalties were properly assessed under § 6653(b).

1. *The Debtor's prior convictions for mail and wire fraud do not collaterally estop him from contesting the necessary fraudulent intent under § 6653.*

■ The question of fraud is an issue of fact which must be established by the Internal Revenue Service through clear and convincing proof. *Estate of Upshaw v. Commissioner*, 416 F.2d 737 (7th Cir.1969), cert. den. 397 U.S. 962, 90 S.Ct. 993, 25 L.Ed.2d 254 (1970). The burden of proof is on the IRS to show by clear and convincing evidence that the circumstances surrounding the failure to file returns strongly and unequivocally indicates an intention to avoid the payment of taxes. *Stoltzfus v. United States*, 398 F.2d 1002 (3rd Cir. 1968), cert. den. 393 U.S. 1020, 89 S.Ct. 627, 21 L.Ed.2d 565 (1969). Fraud within the meaning of § 6653 means an intentional wrongdoing on the part of a taxpayer motivated by the specific purpose to evade tax known or believed to be owing. Such fraud may be established through circumstantial evidence including the following factors: persistent understatement of income over a period of years, failure to keep adequate books and records, misstatement of facts to a revenue agent, and concealing ownership of property. *Estate of Upshaw*, 416 F.2d 737, 741 (7th Cir.1969), cert. den. 397 U.S. 962, 90 S.Ct. 993, 25 L.Ed.2d 254 (1970).

The IRS argued that the Debtor's prior criminal conviction for mail and wire fraud collaterally estops the Debtor from asserting that he lacked the requisite fraudulent intent in these subsequent civil proceedings, relying upon *Plunkett v. Commissioner*, 465 F.2d 299 (7th Cir.1972). In *Plunkett*, the Seventh Circuit held that the petitioner's conviction for tax evasion pursuant to a guilty plea collaterally estopped

---

9. For the 1981 tax year, § 6653(b) read as follows:

(b) Fraud:—If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50% of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). In the case of a joint return under § 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse."

For the 1982–84 tax years, § 6653(b) read as follows:

(b) Fraud:—(1) In general,—if any part of any underpayment (as defined in subsection (c))

of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50% of the underpayment. (2) Additional amount for portion attributable to fraud.—There shall be added to the tax (in addition to the amount determined under paragraph (1), an amount equal to 50% of the interest payable under § 6601—

(A) With respect to the portion of the underpayment described in paragraph 1 which is attributable to fraud, and

(B) for the period beginning on the last day prescribed by law for payment of such underpayment (determined without regard to any extension) and ending on the date of the assessment of the tax, (or, if earlier, the date of the payment of the tax).

the petitioner from denying the requisite fraudulent intent for those taxable years. The Court noted that "most courts faced with the question have held that a prior conviction for tax evasion after a trial on the merits operates as a collateral estoppel on the issue of civil fraud in a fraud penalty proceeding. The criminal conviction necessarily carries with it the ultimate factual determination that the underpayments of tax were due to fraud within the meaning of § 6653(b)." *Id.* at 305.

A criminal conviction for mail and wire fraud, however, does not necessarily carry with it the ultimate factual determination that tax underpayments were due to fraud within the meaning of § 6653(b). To establish liability for the civil fraud penalty, the government must establish (1) a knowing falsehood, (2) the intent to evade tax, and (3) the underpayment of tax. While a conviction for tax evasion necessarily also establishes these elements, the Debtor's conviction for mail and wire fraud focuses on a separate type of intent and does not necessarily establish the intent to evade tax or the underpayment of tax. *Considine v. United States,* 683 F.2d 1285 (9th Cir.1982). Although the IRS correctly notes that the intent required for civil liability under § 6653 does not rise above the level required for a criminal conviction for tax evasion, this argument fails to recognize that the issue of fraudulent intent to evade payment of taxes was not litigated in the course of the prior mail and wire fraud convictions. The Debtor, therefore, is not collaterally estopped from arguing that he did not possess the requisite fraudulent intent within the meaning of § 6653(b).

2. *The IRS has established by clear and convincing evidence that the Debtor possessed the wilful intent to fraudulently evade taxes.*

■ Fraud within the meaning of § 6653 means an intentional wrongdoing on the part of a taxpayer motivated by the specific purpose to evade tax known or believed to be owing. Such fraud may be established through circumstantial evidence including the following factors: persistent understatement of income over a period of years, failure to keep adequate books and records, misstatement of facts to a revenue agent, and concealing ownership of property. *Estate of Upshaw,* 416 F.2d 737, 741 (7th Cir.1969), *cert. den.* 397 U.S. 962, 90 S.Ct. 993, 25 L.Ed.2d 254 (1970). A taxpayer's failure to file returns for an extended period of time is not sufficient in and of itself to justify the imposition of fraud penalties, but it is persuasive evidence of an intent to defraud the government. *Stoltzfus v. United States,* 398 F.2d 1002 (3rd Cir.1968), *cert. den.* 393 U.S. 1020, 89 S.Ct. 627, 21 L.Ed.2d 565 (1969). The IRS must produce some convincing affirmative indication of the required specific intent, *id.* at 1003, and a showing that the taxpayer had no contemporaneous reasonable basis for believing that taxes were not owed will satisfy this requirement. *Id.* at 1005. The assessment of a fraud penalty under § 6653 does not require the government to show an affirmative action consisting of actively deceptive conduct by the taxpayer. *Id.*

■ Applying these standards to the conduct of the Debtor, the Court finds the IRS has established by clear and convincing evidence that the Debtor possessed the intent to evade the payment of taxes for each of the years in question. The Debtor failed to file tax returns for each of the tax years in question and, while such failure is not in itself sufficient to prove fraud, it is persuasive circumstantial evidence of fraud when coupled with other indicia or badges of fraud. *Solomon v. Commissioner,* 732 F.2d 1459 (6th Cir.1984). In addition, the Debtor failed to report income over an extended period of time. The Debtor testified that he began embezzlement activities as early as the 1970s and that these funds were not reported on his income tax returns for any of the relevant tax years. While the IRS is only seeking to assess fraud penalties for the tax years 1981 through 1984, the Debtor's admission that he failed to report income for this extended period of time constitutes circumstantial evidence of the intent to evade paying taxes thereon. The Debtor also testified that he did not maintain systematic records of his embezzlement or his trading transac-

tions, making it difficult (if not impossible) to determine the exact amount of income on which taxes may be due. The Debtor also testified that he routinely destroyed the working papers through which he would record his securities transactions so that he was unable to furnish the IRS with access to these records.

These omissions, coupled with the fact that the Debtor was a sophisticated and experienced attorney who had filed tax returns in the past, and was well aware of his duty to continue doing so, constitute persuasive evidence of a fraudulent intent to evade taxes. The Debtor was convicted of mail and wire fraud by the United States District Court for the Northern District of Illinois, and while such conviction does not estop the Debtor from contesting the fraud penalties, it is persuasive and competent evidence of his willingness to defraud others in business transaction. These factors taken together as a whole establish through clear and convincing evidence that the Debtor was aware of his obligation to pay taxes and intentionally failed to file tax returns reporting his income so as to avoid the payment of taxes thereon.

3. *Debtor's gambling addiction does not preclude him from forming the requisite fraudulent intent to evade payment of taxes.*

 The Debtor also argues that his compulsive gambling disorder prevented him from forming the requisite fraudulent intent in that his actions were dictated by this gambling disorder rather than the willful intent to evade taxes. The Debtor presented his own testimony and the testimony of his treating psychiatric physician to establish that the Debtor was psychologically incapable of filing tax returns for the years in question on the grounds that this action would have required the Debtor to look at the extent of his gambling addiction and to recognize the magnitude of his compulsive behavior. Based on his evaluation and treatment of the Debtor, the treating physician testified that it was his opinion with a reasonable degree of medical and psychiatric certainty, that the Debtor did not intend to defraud the IRS by not filing

tax returns for the years in question. The Debtor argues that the fraud penalties were therefore improperly assessed against him. The Court finds, however, that (1) as a matter of law, a compulsive gambling disorder cannot be the basis of a defense to a nongambling offense such as the fraudulent non-payment of taxes, and (2) even assuming a gambling disorder may impair a taxpayer's ability to form such fraudulent intent, the evidence presented in this case does not establish that the Debtor was unable to form such intent.

The Debtor in this matter made a similar argument in the course of his criminal proceedings and the appeal of his conviction taken before the Seventh Circuit Court of Appeals. *United States v. Carmel*, 801 F.2d 997 (7th Cir.1986). The Debtor argued in this criminal appeal that the district court erred in rejecting his insanity defense based on his compulsive gambling disorder. The Debtor claimed that he was unable to conform his conduct to the requirements of the law because of this compulsive gambling disorder. The Court of Appeals applied the *Frye* test in determining whether there was a sufficient nexus between the alleged disease of compulsive gambling and the nongambling crimes charged. *Id.* at 998. *See also Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). Under the *Frye* standard, the Court explicitly held that there was an insufficient nexus between compulsive gambling and nongambling offenses generally for a compulsive gambling disorder to serve as the basis of an insanity defense to such offenses. *Id.* at 999. Similarly, the Court of Appeals in *United States v. Shorter*, 809 F.2d 54 (D.C.Cir.1987), *cert. den.* 484 U.S. 817, 108 S.Ct. 71, 98 L.Ed.2d 35 (1987), held that there is no general acceptance among the experts in the relevant scientific community that there is a link between pathological gambling and the failure to pay taxes. The court in *Shorter* looked to established precedent holding that pathological gambling is not sufficiently relevant to the issue of criminal intent with respect to an insanity defense, and concluded that, although the issue in an insanity case differs to some degree in theory from the issue of

willfulness, the underlying question in such cases is sufficiently analogous since the mental state at issue is one of willfulness and specific intent. *Id.* at 61. Based on these precedents, the Court finds as a matter of law, that the Debtor's compulsive gambling disorder does not operate to prevent the Debtor from forming the requisite fraudulent intent to evade payment of taxes. The Debtor argues that the issue in his criminal appeal and in the *Shorter* case is distinguishable in that those proceedings focused on the propriety of expert testimony regarding the gambling disorder, while the testimony presented in these proceedings is that of the treating physician offered as lay testimony rather than expert evidence. While the Court recognizes the distinction and did not exclude the psychiatric testimony on these grounds, the Court finds that the evidence presented is insufficient to establish that the Debtor's gambling propensities somehow related to his inability to pay his taxes when they were due. The treating physician testified that the Debtor was unable to file his tax returns on a timely basis since he would have had to come to terms with the magnitude of his gambling addiction and the related embezzlement activities. The treating physician acknowledged, however, that "in dealing with the monies associated with his professional corporation, his legal activities, Mr. Carmel was not conflicted and was therefore able to proceed in an orderly fashion and file timely returns and do whatever was necessary, but in the area where it would be necessary to confront and contain and observe the magnitude of his activities in his personal area, in the area that pertained to the gambling addiction, I believe he was psychologically unable to deal with those tax returns." Transcript, p. 129. According to the treating physician, he was aware from discussions with the Debtor that certain tax returns had been filed but he did not recall any specific discussions with the Debtor regarding which tax returns the Debtor may have been able to file and those which he could not. Based on a conversation with the Debtor's attorney the day before his testimony, the treating physician stated that given what he knew about the Debtor and from the psychological configuration of the addiction, it made perfectly good sense that he was able to file professional corporation tax returns and yet apparently was unable to file personal tax returns. Transcript p. 144.

When asked when he first discussed with the Debtor whether or not the failure to file tax returns for 1981 through 1984 was an intentional act, the treating physician stated that, "I don't recall that; I don't even recall the discussion would have been around that specific of an item." Counsel for the IRS followed up this line of questioning by asking, "Are you saying that you have no specific recollection of any specific conversation with the Debtor during your years of therapy regarding whether or not his failure to file those tax returns was intentional?" The treating physician replied, "That is correct." Transcript p. 146. On redirect the treating physician stated that he did not recall specifically whether the Debtor indicated that he knew he should have filed tax returns, but that the issue of the tax returns and the timely filing were not the doctor's primary concern, it would not have been a major topic. Transcript p. 149.

In light of this testimony, the Court concludes that the evidence presented regarding the Debtor's alleged inability to file tax returns due to his compulsive gambling disorder is insufficient to rebut the finding of fraudulent intent established by the badges of fraud discussed previously. The Debtor clearly admitted that he was aware of his obligation to file tax returns, but that he did not do so due to the magnitude of his trading activities and the difficulty in tracing the embezzled income. While the Court recognizes that there was likely some serious psychological consequences associated with addressing his activity, the evidence presented fails to establish that the Debtor was unable to form the intent to not file tax returns, thereby avoiding the payment of taxes due. The Court finds therefore that the fraud penalties were properly assessed under § 6653.

**4. *Neither the Debtor's voluntary confession nor his subsequent incarceration negate his fraudulent intent.***

 The Debtor also argues that his voluntary disclosure of his embezzlement and gambling activities in 1984 presents a defense to the charges of fraudulent evasion of tax. According to the Debtor, the government was aware of his conduct from the moment of confession and that knowledge, along with the Debtor's awareness of that knowledge, would negate any intent to deceive the IRS. The Debtor also asserts that by causing his professional service corporation to file returns reflecting income paid to the Debtor, he alerted the IRS and did not intend to defraud them. The Debtor argues that he is like a tax protestor who affirmatively alerts the government of his intent to not file and should thereby escape liability for fraud penalties. *See, e.g., Zell v. Commissioner,* 763 F.2d 1139 (10th Cir.1985). Unfortunately for the Debtor, the Seventh Circuit Court of Appeals has clearly held that a taxpayer cannot avoid fraud penalties by notifying the Commissioner that he has been evading taxes and that he will continue to do so. *Granado v. Commissioner,* 792 F.2d 91, 94 (7th Cir.1986), *cert. den.* 480 U.S. 920, 107 S.Ct. 1378, 94 L.Ed.2d 692 (1987). *See also Plunkett v. Commissioner,* 465 F.2d 299, 302 (7th Cir.1972). Thus, the Debtor's voluntary confession in 1984 and the fact that the tax returns for the years 1983 and 1984 did not become due until after such confession, does not operate to negate the fraudulent intent to evade payment of those taxes. Likewise, the fact that the Debtor filed tax returns for his corporation which reflected some income as having been paid to him or that he made one estimated payment which was not accompanied by a tax return in 1983 does not negate the intentional failure to file individual returns and pay the related tax believed to be owing.

 The fact that the Debtor was subsequently incarcerated for a period of years also does not justify the failure to file such returns. The Debtor argues that his incarceration in 1985 prevented him from obtaining the necessary access to his books and records and effectively precluded him from filing tax returns for the year in question and notes that his request for an extension of the time to file was denied or ignored by the Internal Revenue Service. The fact that the Debtor was incarcerated for a period of time after the tax returns in question became due does not mitigate the failure to timely file such returns. The Debtor had access to his records prior to his incarceration and presented no reason why he could not timely prepare the 1981, 1982 and 1983 tax returns other than his gambling disorder. Furthermore, his embezzlement and stock market activity ceased in early 1984, thus enabling the Debtor to calculate with some degree of certainty the embezzlement and stock market activity income generated in 1984 despite the ongoing criminal investigation and his subsequent incarceration in 1985.

 Lastly, the Debtor's argument that he failed to file his tax returns on the advice of counsel due to the ongoing criminal investigation does not present a defense to the fraud penalties assessed against him. The taxpayer in *Stoltzfus* testified that his continued failure to file tax returns was prolonged by ignorance and fear of what he called summary criminal prosecution and that this evidence established that his purpose was not to avoid the payment of taxes but merely to avoid contemplated criminal penalties for neglecting to pay. 398 F.2d 1002 (3d Cir.1968), *cert. den.* 393 U.S. 1020, 89 S.Ct. 627, 21 L.Ed.2d 565 (1969). The Court of Appeals rejected this position and held that the continued failure to file based on the fear of criminal prosecution was in itself an admission that he did not file in order to conceal his prior years' defalcations. The court found that such conduct is evidence of an intent to fraudulently avoid paying taxes knowingly due. 398 F.2d 1002, 1005 (3rd Cir.1968). Likewise, the fact that the Debtor here may have been advised by his counsel not to file returns due to the ongoing

criminal investigation would not operate to negate the intent to wilfully evade payment of such taxes when due. The Court therefore finds that fraud penalties were properly assessed against the Debtor under § 6653(b) for the taxable years 1981 through 1984. *See also United States v. Boyle*, 469 U.S. 241, 105 S.Ct. 687, 83 L.Ed.2d 622 (1985) (holding that a taxpayer cannot rely on his agent's errors to avoid tax liability).

## CONCLUSION

The Court therefore finds in accordance with the forgoing discussion that: (1) the income embezzled by the Debtor constitutes ordinary income taxable to the Debtor; (2) the Debtor failed to prove that the funds received from his professional service corporation actually represented loans to the Debtor, and thus the funds were properly treated as ordinary income received as compensation for services rendered; (3) the Debtor's stock market trading activities represent a trade or business in which the Debtor was engaged within the meaning of Internal Revenue Code § 62 and § 162, so that the Debtor may deduct the ordinary and necessary expenses of producing such business income; (4) the losses incurred by the Debtor as a result of the stock market trading activities constitute capital losses within the meaning of Internal Revenue Code § 1211 and § 1221, since the stocks and options traded did not constitute property properly included in the Debtor's inventory and the Debtor was not a dealer in such property; and (5) the Debtor's alleged gambling disorder did not preclude him from forming the requisite fraudulent intent to willfully evade payment of taxes for any of the tax years in question so that fraud penalties were properly applied pursuant to Internal Revenue Code § 6653.

In accordance with the stipulations and representations of Counsel, the Court will not enter a judgment order in this proceeding until the parties have determined the final tax liability of the Debtor.

## APPENDIX

In the United States Bankruptcy Court for the

Northern District of Illinois

Eastern Division

In Re: Richard J. Carmel, Debtor.

Richard J. Carmel, Plaintiff,

v.

United States of America, Commissioner of Internal Revenue Service, Defendants.

No. 84 B 03676

89 A 1134

Feb. 12, 1991.

### STIPULATION OF FACTS

ERWIN I. KATZ, Bankruptcy Judge.

Richard J. Carmel, the debtor, and the United States, hereby stipulate to the following:

For the period between January 1, 1981 and March 15, 1984, the figures set forth in the Debtor's List of Exhibits for Trial, under the headings for Group Exhibits 1–6, 8–12 and 14–16, reflect the approximate magnitude of (1) the number of the debtor's security transactions for the period of time set forth in each such paragraph; (2) the quantity of securities involved in these transactions; and (3) the dollar amounts of these transactions. The United States is *not* stipulating to the *specific figures* for (1) the number of the debtor's security transactions for the period of time set forth in each such paragraph; (2) the quantity of securities involved in these transactions; and (3) the dollar amounts of these transactions.

This stipulation is valid and binding only for the purpose of determining the debtor's status as a gambler and/or dealer and/or trader and/or investor in securities during the years 1981–84, and only insofar as the debtor's status as such relates to his possible right to take business expense deductions under the Internal Revenue Code with respect to his personal federal income

tax liabilities for 1981–84. This stipulation is not valid or binding for any other purpose, including but not limited to determining the specific amount of any such deduction the debtor may be entitled to with respect to his personal federal income liabilities for 1981–84, and the determination of any tax liabilities of Richard J. Carmel, Ltd.

/s/ Benjamin R. Norris 2/12/91
BENJAMIN R. NORRIS
Trial Attorney, Tax Division
Department of Justice
P.O. Box 55
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307–6574
(FTS) 367–6574
/s/ Michael S. Hyman (JS & A)
MICHAEL HYMAN
Jeffrey Strange & Assoc.
717 Ridge Rd.
Wilmette, IL 60091
Telephone: (708) 256–7377
Attorneys for the Debtor